**COOS BAY LUMBER CO. et al. v. PILLSBURY, Deputy Com'r.**

**No. 23407–S.**

District Court, N. D. California, S. D.

April 7, 1941.

915

John H. Black, Edward R. Kay, and Lyman Henry, all of San Francisco, Cal., for libelants.

Frank J. Hennessy, U. S. Atty., and W. E. Licking and James T. Davis, Asst. U. S. Attys., all of San Francisco, Cal., for respondent.

ST. SURE, District Judge.

Libel under the Longshoremen's and Harbor Workers' Compensation Act § 1 et seq., 33 U.S.C.A. § 901 et seq., by Coos Bay Lumber Company, the owner and operator of the S. S. "Lumberman", and its insurance carrier, Fireman's Fund Insurance Company, to set aside and enjoin the enforcement of a compensation award, made by the Deputy Commissioner for the Thirteenth Compensation District, to the dependents of Carl Olaf Swanson, deceased. The "Lumberman" is a vessel of 2,333 gross tons register, carrying lumber from Marshfield, Oregon, to ports in California. Swanson met his death on August 13, 1939, in navigable waters of the United States, namely, Oakland estuary in the San Francisco Bay, California, while engaged with other members of the crew of the ship in discharging cargo.

A claim for compensation under the Act was thereafter filed with the Commissioner and hearing had. On December

19, 1940, the Commissioner made an award to the widow and the minor daughter of decedent, finding that decedent belonged in a class of men who "had the status of traveling stevedores or winchmen * * * and had no duties of importance to perform in connection with the navigation of the vessel;" and "was employed as such a winchman and at the time of his injury was not on board the vessel primarily to aid in its navigation but was in fact at said time engaged in an unloading operation; that he was, therefore, at the time of his injury not a member of the crew of the vessel." If supported by the evidence, the finding of the Commissioner is conclusive.

■ The question for decision is whether decedent was a member of the "Lumberman's" crew at the time of his death. If he was, his dependents are not entitled to compensation under the Act, which provides that "no compensation shall be payable in respect of the disability or death of—(1) A master or *member of a crew of any vessel.*" 33 U.S.C.A. § 903(a). [Emphasis supplied.] The Act should be liberally construed. Baltimore & Philadelphia Steamboat Co. v. Norton, 284 U.S. 408, 414, 52 S.Ct. 187, 76 L.Ed. 366.

■ In enacting the Longshoremen's and Harbor Workers' Compensation Act, Congress did not define the term "member of a crew of any vessel." In the term "there is implied a definite and permanent connection with the vessel, an obligation to forward her enterprise and to protect her in emergency, and a right to look to her and her earnings for wages. If she has a master, there is subjection to his commands. The nature of the work done is not determinative. Engineers and cooks as well as sailors are included. Longshoremen who load and unload a vessel under temporary local employment do not become members of the crew, nor do mechanics who similarly come aboard her to repair or clean or paint her; nor do those permanently employed upon her cease to be members of the crew because they are put at the same sort of work." Maryland Casualty Co. v. Lawson, 5 Cir., 94 F.2d 190, 192.

■ In South Chicago Co. v. Bassett, 309 U.S. 251, 260, 60 S.Ct. 544, 549, 84 L. Ed. 732, Chief Justice Hughes in construing the Act said: "We find little aid in considering the use of the term 'crew' in other statutes having other purposes. This

Act, as we have seen, was to provide compensation for a class of employees at work on a vessel in navigable waters who, although they might be classed as seamen (International Stevedoring Co. v. Haverty, supra [272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157]), were still regarded as distinct from members of a 'crew'. They were persons serving on vessels, to be sure, but their service was that of laborers, of the sort performed by longshoremen and harbor workers and thus distinguished from those employees on the vessel who are naturally and primarily on board to aid in her navigation. See De Wald v. Baltimore & Ohio R. Co., 4 Cir., 71 F.2d 810; Diomede v. Lowe, 2 Cir., 87 F.2d 296; Moore Dry Dock Co. v. Pillsbury, 9 Cir., 100 F.2d 245."

In the South Chicago case, supra, 309 U.S. page 255, 60 S.Ct. page 546, 84 L.Ed. 732, decedent was a deckhand on a fueling lighter. His chief task was " 'facilitating the flow of coal from his boat to the vessel being fueled—removing obstructions to the flow with a stick. He performed such additional tasks as throwing the ship's rope in releasing or making the boat fast. He performed no navigation duties. He occasionally did some cleaning of the boat. He did no work while the boat was en route from dock to the vessel to be fueled.' The Court of Appeals [7 Cir., 104 F.2d 522] thought it significant that his only duty relating to navigation was the incidental task of throwing the ship's line; that his primary duty was to free the coal if it stuck in the hopper while being discharged into the fueled vessel while both boats were at rest; that he had no duties while the boat was in motion; that he was paid an hourly wage; that he had no 'articles'; that he slept at home and boarded off ship; that he was called very early in the morning each day as he was wanted; that while he had worked only three weeks, and it might have been possible that he would have been retained for years to come, his employment was somewhat akin to temporary employment." Under these facts it was held that decedent was a laborer and not a member of the crew.

As the last expression of the Supreme Court upon the subject, the South Chicago case will be accepted as a criterion for the present case, the undisputed facts of which follow.

Decedent had followed the sea for many years, and had been a member of the Sailors' Union since July 1, 1903. Like

the rest of the crew, he came from the hiring hall of the union, the rules of which required that he be a member of the crew, and that the ship carry two winchmen. The Bureau of Marine Inspection and Navigation of the Government required the S. S. "Lumberman" to carry, among others, two certified lifeboat men, six able seamen, and three seamen. The "Lumberman" carried twelve able seamen, of whom decedent was one, designated as a winch-driver. He held an AB certificate dated April 5, 1937, which was a prerequisite to his employment. In the ship's monthly report to the United States Shipping Commissioner he was listed as an able seaman. He also had a certificate as Efficiency Lifeboat Man, and was assigned a station in the ship's lifeboat drill. His fourteen-year-old daughter testified her father told her that "he couldn't go on the ship without" his papers. He was on the ship's payroll as a member of the crew, like everyone on the ship except the captain, and the records of Coos Bay Lumber Company also showed him as a member of the crew. He received a monthly wage, but rated overtime on the same basis as other members of the crew. He drove the winches in unloading, and worked with his shipmates loading the hold, where winches were not used. One who operates a winch at sea must be first an able seaman. A longshoreman competent to operate a winch on shore could not operate one at sea without special training. The captain, when asked why he shipped a seaman who was a winchdriver "instead of having that work done by shore-workers", testified: "A number of reasons, the first one I think is, the men that we train for that type of work on board ship are much more competent than the casual laborer that we pick up on shore. They are more interested in doing it right in the first place, because it is a steady job * * * and also we have so much of sailoring, seamanship, to do at sea that we find it to be advantageous to carry expert seamen even in addition to the number of men required by law to get this work done."

At sea, decedent did general work, performing duties which could not be done in port, namely: Inspecting, oiling, greasing, and repairing the steering gear; repairing shrouds and guys; splicing ropes and wires; taking care of the winches (in an emergency a winch might be used at sea); renewing and replacing various parts of the cargo-handling equipment; assisting in overhauling and keeping the lifeboats seaworthy; doing some blacksmithing in repairing rails damaged at sea.

Decedent worked from 8:00 A. M. to 5:00 P. M. every day, and ate and slept on the ship, even when she was in the home port. He was subject to the captain's orders, and in case of emergency, to the orders of the chief officer.

Upon consideration of the evidence and the law I have reached a conclusion contrary to that of the Deputy Commissioner. I am of the opinion that decedent was a member of the "Lumberman's" crew. I therefore find that the evidence wholly fails to sustain the Deputy Commissioner's finding that decedent was a laborer and not a member of the crew. The compensation order and award of December 19, 1940, will therefore be set aside and its enforcement permanently enjoined.